UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
NIKODEM WTULICH,
                Petitioner,

           - against -

MAGDA FILIPKOWSKA,
                Respondent.
------------------------------------------------X

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

16-CV- 2941 (JO)

James Orenstein, Magistrate Judge:

Petitioner Nikodem Wtulich ("Wtulich") seeks the return of his daughter AW pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Convention") and the International Child Abduction Remedies Act ("ICARA"). *See* Docket Entry ("DE") 1 (Petition); T.I.A.S. No. 11,769, at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986); 22 U.S.C. § 9001, *et seq.*[1] Respondent Magda Filipkowska ("Filipkowska"), AW's mother, contends that AW is now settled in the United States, and that Wtulich's untimely petition must therefore be denied; she also asserts that Wtulich has in any event acquiesced to AW's retention in this country. *See* DE 11 (Answer) at 4-7. With the parties' consent, I presided at a bench trial of the matter on April 23-24, 2018. *See* DE 44; DE 50; DE 51; DE 53 (trial transcript ("Tr.") pages 1-58); DE 54 (Tr. pages 59-145); 28 U.S.C. § 636(c). The parties later submitted their proposed findings of fact and conclusions of law. *See* DE 56 ("Wtulich FFCL"); DE 58 ("Filipkowska FFCL"). For the reasons set forth below, I now grant the petition. Briefly stated, I find that AW habitually resided in Poland, that Wtulich was exercising parental control until Filipkowska wrongfully retained AW in this country, and that AW is not settled in this country in the pertinent legal sense. Wtulich is therefore entitled to have AW returned to him.

---

[1] I refer to the parties' minor daughter by her initials and omit other immaterial identifying details to protect her privacy. *See* Fed. R. Civ. P. 5.2(a)(3).

I.  Findings of Fact

AW was born in 2008 in Warsaw, Poland. Her parents were never married to one another. *See* Tr. at 9. AW lived mostly with Filipkowska in Pisz, Poland, but Wtulich regularly spent time with her, playing soccer and celebrating holidays together. *See* Tr. at 11, 13; Filipkowska FFCL ¶ 6.

Wtulich also made decisions regarding AW's travel outside of Poland. He twice granted the requisite permission for AW to obtain a passport, allowing Filipkowska to travel with AW to the United States several times between 2008 and 2013 to visit family in New York. *See* Tr. at 13-14, 79-81. In June 2013, Wtulich again gave his consent to Filipkowska to travel to the United States with AW, this time to attend her brother's wedding. On this occasion, however, Wtulich believed only that he was consenting to have AW spend about three months in New York before returning to Poland; indeed, he and Filipkowska discussed choosing a school in Poland for AW to attend upon her return in the fall. *See* Tr. at 14-15, 75-76.

In September 2013, after taking AW to the United States based on Wtulich's consent for her to be there for about three months, Filipkowska informed Wtulich via Skype that she wanted to stay in the United States longer and enroll AW in kindergarten in New York. Wtulich expressed his disagreement with the plan, but eventually agreed. Thereafter, Filipkowska stopped communicating with Wtulich except through emails. *See* Tr. at 15; Filipkowska FFCL ¶ 12; Wtulich FFCL ¶ 10.

Notwithstanding Filipkowska's decision to extend AW's stay in the United States, Wtulich expected AW would have to return to Poland shortly because she was traveling on a tourist visa that permitted her to stay in this country only for six months. In December 2013, however, Filipkowska informed Wtulich that she intended to retain AW in the United States so that she could attend kindergarten in New York. Fearing that he would risk losing contact with AW forever if he objected,

2

Wtulich sent an email to Filipkowska stating that he was "happy to hear that [she] made this decision," and that this was "also good for [AW] because [he would] rather she went to kindergarten there." Ex. U; Filipkowska FFCL ¶ 13; Tr. at 33-34.[2] That same month, however, concerned that Filipkowska intended to keep AW in the United States indefinitely, Wtulich spoke with an attorney. *See* Tr. at 17-18; Filipkowska FFCL ¶ 16.

Wtulich maintained contact with AW through regular Skype calls, and in April 2014, he traveled to the United States for two weeks to spend time with AW. He also planned to discuss her return to Poland. Tr. at 16-17, 20-21; Filipkowska FFCL ¶ 15; Ex. D. Instead, sometime around May 2014, Filipkowska informed Wtulich of her intent not to return to Poland with AW. Wtulich again spoke with an attorney and, on June 12, 2014, filed an ICARA Application with the Department of State. *See* Tr. at 17-20; Ex. 2 ("Application"). In the Application, Wtulich wrote the following:

> On June 26, 2013, [Filipkowska], together with our daughter, [AW], left for the United States to visit [Filipkowska's] parents living there in Queens, [New York].
>
> At the time of the removal, I granted [Filipkowska] permission for our daughter to travel to the US for a period not to exceed six months.
>
> On or about December 18, 2013 [Filipkowska] informed me that she decided to stay in the US for a another 3 months. I opposed, however without any avail.
>
> I decided then, and have visited my daughter in New York between April 11th and 25th of this year.
>
> On May 30th, 2014 I have been informed by [Filipkowska], that neither she nor our daughter will return to Poland and I will not be permitted to take our daughter for vacation in Poland.
>
> I presently maintain brief weekly contacts with my daughter through Skype.

---

[2] "Ex." refers to exhibits admitted at the bench trial. Wtulich numbered his exhibits; Filipkowska designated hers with letters.

3

> I would like my daughter to live in Poland, but I will respect her mother's decision to stay in the US, subject however, to my rights as the father to maintain meaningful direct personal contacts with my daughter.
>
> I would like to have those contacts take place in Poland because my parents and sister live here and they were all very close with my daughter and miss her very much. I would also like [AW] to keep speaking Polish and learn the culture and customs of the Poles.

Application at 2.

AW's passport expired in 2015, and Filipkowska requested Wtulich's permission to renew it. Wtulich refused. Instead, he filed the Petition in this case on June 7, 2016. *See* Petition at 10; Tr. 79-81, 90.

Filipkowska married in October 2016. She later filed a petition on her own behalf for a green card, with her husband serving as her sponsor. Her husband could not, however, sponsor AW for a green card because AW no longer had a valid passport. *See* Tr. at 79-81, 94-95.

Filipkowska, her husband, and AW now reside together in New Jersey. AW attends school there; she excels in her education and is enrolled in several activities, including swimming and tennis. She has several friends in the United States, as well as a dog and a cat. While she speaks basic Polish, she does not read or write in that language. She prefers to remain in the United States but lacks the legal status that allows her to do so. *See* Tr. 96-99; 128-129; Filipkowska FFCL ¶¶ 44-52.

II. Conclusions of Law

    A. The *Prima Facie* Case

The Convention, to which both the United States and Poland are signatories, "seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (citing

4

Convention, Art. 1, Treaty Doc., at 7). "By operation of the Convention, a United States District Court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim." *Blondin v. Dubois (Blondin II)*, 189 F.3d 240, 245 (2d Cir. 1999) (internal citations omitted); Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

To prevail on a wrongful removal or retention claim under the Convention, the petitioner must establish, by a preponderance of the evidence, that

> (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention.

*Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005); *see also Abbott*, 560 U.S. at 8; Convention, art. 3.

1. <u>Habitual Place of Residence</u>

Analysis of a child's habitual residence begins by considering the relevant intentions of "the person or persons entitled to fix the place of the child's residence, which is likely to be the parents in most cases." *Gitter*, 396 F.3d at 132 (internal citations omitted). Where the parents disagree as to the place of the child's habitual residence, the court must determine the intentions of the parents "as of the last time that their intentions were shared." *Id.* at 133. The parties' shared intent is a question of fact. *Id.*

The parties agree that until Filipkowska brought AW to the United States on June 24, 2013, AW's habitual residence was Poland. *See* Filipkowska FFCL ¶ 11. They disagree, however, about how much longer they shared intent on the matter. Filipkowska characterizes Wtulich's December 2013 email as evidencing his consent to AW remaining in the United States. *See* Answer at 2. Wtulich disagrees: he testified that when he wrote that email, he "was in great emotions, and …

5

didn't have a constructive, sufficient contact with" Filipkowska or AW and that he "was begging her in this email to call [him] to make any kind of contact with [him] to talk about this situation." Tr. at 33. He also testified that "it wasn't true" that he was "happy that [Filipkowska] made the decision to stay in the United States[;]" rather, he wrote the email because he "didn't want to … make … the conflict bigger." *Id.* at 33-34. He further explained,

> I didn't want to do anything wrong against [Filipkowska] because she was holding my daughter at that time. And I was like 100 percent dependent on – on [the] mother of my child which – who wasn't contacting me…. She wasn't contacting me about my daughter, written to Poland, and there was no constructive emails from [Filipkowska]. She didn't want to talk about [the] return of my child to Poland. It was like no discussion, and I was feeling deadly scared at that time. I remember that I wrote this email … [in] great fear – begging her to contact me about this issue…. In general it wasn't true what I had written this. It was because of my – because of my state of fearing.… I wanted to make Mother to make contact with me and that's it. If it – your daughter would be kidnapped like that, you would do everything, you would do everything, what kidnap[per] will tell to you. You would do every – everything, and she would listen to the kidnapper.

*Id.* at 34-35.

Filipkowska also purports to find proof of shared intent in the fact that that when she told Wtulich in May 2014 of her intention to stay in the United States with AW, Wtulich never expressed any disagreement. On June 12, 2014, Wtulich wrote in an email:

> Nobody would think about kidnapping [AW]. You have nothing to fear as we are concerned, nothing on my, my parents', or anybody else. You simply prefer to live there. I am not going to use the law in the way you described family kidnapping because you have the right to live where you want…

Ex. V. In a follow-up email time-stamped five minute later, Wtulich wrote:

> Neither me nor anyone else is making you come to Poland. You also write that if you don't come, we will file a suit in court. Magda, get down on earth. Nobody is making you do anything. I'm asking you and talking you into it, but if you don't want to, I understand.

6

Ex. X. Wtulich explained these emails in terms similar to his explanation of the one in December 2013:

> I was sure that if I would … say to Mother that I don't agree for longer stay in the United States, she will hide my child. She would hide herself and my child. What she told me on April 9th or 10th when I was in New York to talk to her and to meet my daughter. Mother told me that if you file a case to court, I will hide. Your daughter will change school. We will move from this place … and you will not find us.… And the same thing [Filipkowska's] parents told me … on July 2014 when they decided primary [sic] to meet me and to – and talk with me, they told me that, if you file a case, you will not see your daughter.… We will move and you will have chance to find us. And that he told me also that I will hire attorney; that … they can defend in courts for years. And this time – during that time period you will not see your daughter.

Tr. at 49.

I credit Wtulich's testimony in general, and in particular his assertion that he did not consent to AW remaining in the United States indefinitely. I thus find that the parties' last shared intent was for AW to return from her summer 2013 vacation in the United States and reside in Poland.

That finding does not end the inquiry. "[P]arental intent cannot alone establish a child's habitual residence," *Gitter*, 396 F.3d at 133, "nor can it prevent a habitual residence from changing." *Guzzo v. Cristofano*, 719 F.3d 100, 108 (2d Cir. 2013). "Instead, a child's habitual residence changes when the child becomes settled in another country, even if one or both of the parents intend for the child to return to the original country of habitual residence." *Id.* Thus, the court must also consider whether, notwithstanding the parents' intent, "the evidence points unequivocally to the conclusion that the child has become acclimatized to his new surroundings and that his habitual residence has consequently shifted." *Gitter*, 396 F.3d at 133.

> The question in these cases is not simply whether the child's life in the new country shows some minimal degree of settled purpose, but whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to

7

> taking the child out of the family and social environment in which its life has developed.

*Id.* at 134 (internal citations omitted).

A fair reading of the record compels the conclusion that AW's attachments are all in the United States. Her school, activities, friends, and pets are here; she has frequent contact with her mother, who is here, and little with her father in Poland. She speaks English fluently but is illiterate in Polish. Returning her to Wtulich in Poland would plainly be a distressing upheaval in AW's life that would take her "out of the family and social environment in which [her] life has developed" since Filipkowska brought her here as a young child over five years ago.

The latter finding, however, is plainly in tension with the Convention's objective "to dissuade parents … from engaging in gamesmanship with a child's upbringing in order to secure an advantage in an anticipated custody battle." *Gitter*, 396 F.3d at 134. Indeed, "courts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent" because "[p]ermitting evidence of acclimatization to trump evidence of earlier parental agreement could 'open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit.'" *Id.* (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001)); *see also Mota v. Castillo*, 692 F.3d 108, 116 (2d Cir. 2012) ("It would frustrate the objectives of the Convention if a parent or guardian could secure an advantage in an anticipated custody dispute merely by whisking the child away to a foreign land, and retaining her there long enough to amass evidence of the child's acclimatization to the new location.") (citing *Gitter*, 396 F.3d at 134).

While considering evidence of acclimatization makes sense where it occurred during a period of shared parental intent about a child's residence, doing so where the acclimatization occurs only as a result of one parent's unilateral decision frustrates the Convention's purpose. *See Mohácsi v. Rippa*,

8

346 F. Supp. 3d 295, 313 (E.D.N.Y. 2018) (collecting cases); *Ordonez v. Tacuri*, 2009 WL 2928903, at *6 n. 8 (E.D.N.Y. Sept. 10, 2009) ("[I]t would be inappropriate to consider the period of time *after* the alleged wrongful removal in the acclimatization analysis, as this could reward the [allegedly] abducting parent for the time during which the child was [allegedly] wrongfully retained or removed.") (emphasis in original; internal citations omitted). Accordingly, I consider evidence of AW's acclimatization only to the extent it occurred between her arrival in the United States in June 2013 and May 2014, when Filipkowska told Wtulich that she intended to retain AW in the United states. AW began that period accustomed to living in Poland, where she had habitually resided for her entire life. Over the course of the next eleven months, she attended kindergarten for an entire school year. There is no additional cognizable evidence of her acclimatization. Thus, considering both parental intent and acclimatization, I conclude that AW's habitual residence is in Poland.

2. <u>Violation of Exercised Custody Rights</u>

"Under the Convention and ICARA, a federal court looks to the law of the child's place of habitual residence to determine whether a petitioner possessed lawful rights of custody at the time of a child's removal." *Norden-Powers v. Beveridge*, 125 F. Supp. 2d 634, 638 (E.D.N.Y. 2000) (citing Convention, art. 3); *see also Abbott*, 560 U.S. at 10. The Convention defines custody rights as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott*, 560 U.S. at 9 (quoting Convention, art. 5(a)). A petitioner may establish his or her rights of custody through judicial or administrative decisions, legally binding agreements between the parties, or operation of the law of the State. *See Norden-Powers*, 125 F. Supp. 2d at 638 (citing Convention, art. 3).

9

There are no judicial or administrative decisions or legally binding agreements defining Wtulich's or Filipkowska's rights of custody. However, they agree that each has parental authority and that Wtulich's permission is necessary for AW to obtain a passport. *See* Filipkowska FFCL ¶¶ 5, 10; Wtulich FFCL ¶¶ 2, 6; Tr. at 79-80. In addition, Wtulich exercised his rights at the time of the alleged wrongful retention. Prior to AW's vacation to the United States, Wtulich visited AW in Pisz and spent the holidays with her. In addition, he exercised his parental authority by granting permission for her to obtain a passport. Indeed, Filipkowska does not dispute that Wtulich exercised his rights of custody over AW.[3] Thus, Filipkowska's retention of AW in the United States, absent Wtulich's consent, constitutes a breach of Wtulich's custody rights. *See In re Skrodzki*, 642 F. Supp. 2d 108, 114-115 (E.D.N.Y. 2007). I therefore find that Wtulich has established a *prima facie* case of wrongful retention under the Convention.

B. <u>Affirmative Defenses</u>

Where a child has been "'wrongfully removed or retained within the meaning of the Convention,' the child shall be 'promptly returned,' unless an exception is applicable." *Abbott*, 560 U.S. at 9 (quoting the statute now codified at 22 U.S.C. § 9001(a)(4)). The exceptions are "narrow," 22 U.S.C. § 9001(a)(4), and "do not authorize a court to exceed its … Convention function by making determinations, such as a who is the better parent, that remain within the purview of the

---

[3] Polish family law provides that (1) "[a] child remains under parental authority until the age of maturity[;]" (2) "[p]arental authority is exercised by both parents" unless the court determines that it is in the child's interest to "suspend, limit, or deprive one or both parents of parental authority[;]" (3) "[p]arental authority… involves the right and obligation of the parents to exercise custody over the person and property of a child and to raise the child with a due respect for his rights and dignity[;]" and (4) "[i]f both parents have parental authority, each of them is obliged and authorized to exercise that authority." *Kosewski v. Michalowska*, 2015 WL 5999389, at *14 n. 21 (E.D.N.Y. Oct. 14, 2015) (citing Polish Family Law, Chapter 2, Articles 92, 95, 97)).

court with plenary jurisdiction over the question." *Blondin II*, 189 F.3d at 246. Filipkowska seeks to defeat Wtulich's petition by invoking two of these narrow exceptions.

1. Timeliness and Settlement in the New Environment

Filipkowska first argues that I should dismiss the Petition because Wtulich filed it more than a year after she removed AW to the United States, and because AW is now settled in her new environment. *See* Filipkowska FFCL at 11-12. As explained below, I disagree: although Wtulich did not file the Petition within one year of the wrongful retention, AW is not sufficiently settled in the United States to defeat his right under the Convention to her repatriation to her habitual place of residence in Poland.

The Convention mandates the return of a wrongfully removed or retained child unless the petitioner fails to take remedial action within one year and the child has become settled in her new environment.

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Convention, art. 12; *see Lozano v. Alvarez*, 697 F.3d 41, 51 (2d Cir. 2012). ICARA clarifies that "the term 'commencement of proceedings', as used in [A]rticle 12 of the Convention, means … the filing of a petition" in a civil action for the return of the child. 22 U.S.C. § 9003(f)(3).

When a petitioner waits more than a year to file, proof that the child has become settled is merely "a *sufficient* ground for refusing to order repatriation" under Article 12. *Blondin v. Dubois*

11

*(Blondin IV)*, 238 F.3d 153, 164 (2d Cir. 2001) (emphasis in the original). It does not, however, require the court to refuse repatriation: even where a child has become settled in a new environment, "the district court is not necessarily bound to allow the child to remain with the abducting parent." *Blondin II*, 189 F.3d at 246 n. 4 (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) (holding that a "federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.")).[4]

Wtulich filed the petition in June 2016. He knew that Filipkowska had decided to retain AW permanently in the United States, in violation of his parental rights, no later than May 2014 when Filipkowska sent him an email announcing her decision. *See* Wtulich FFCL ¶¶ 13-14. I must therefore consider whether AW has become settled in her new environment.

It is Filipkowska's burden to "show by a preponderance of the evidence that the child is in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects." *In re Koc*, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2011) (internal citations omitted). However, "[t]he ordinary disruptions necessarily accompanying [repatriation]

---

[4] The parties disagree about the significance of Wtulich's ICARA Application to the State Department. Wtulich filed the application on June 12, 2014, less than one year after Filipkowska brought AW to the United States but requested only access to AW rather than repatriation. *See* Application at 1-2. Filipkowska contends that Wtulich therefore did not seek AW's return within the applicable limitations period, while Wtulich argues that he first asserted his rights under the Convention within one year and is not bound by the remedy his counsel indicated in the administrative filing. *See* Filipkowska FFCL at 12; Wtulich FFCL at 5. The disagreement is of no moment: if Wtulich had timely sought AW's return, he would be entitled to that remedy for the reasons set forth above. Even though he did not (because, as explained in the text, ICARA provides that it is only the filing of the Petition that commences the proceedings), he is still entitled to it because, as explained below, AW is not settled in the United States within the meaning of the Convention.

would not by themselves constitute [a risk of harm]." *Blondin IV*, 238 F.3d at 164. Neither the Convention nor ICARA defines what it means for a child to be "settled" or prescribes a method for establishing it, but courts in this circuit understand that a child is settled if she "has significant emotional and physical connections demonstrating security, stability, and permanence in [her] new environment." *Lozano*, 697 F.3d at 56. Relevant factors include the following:

> (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

*Id* at 57. The weight afforded a child's immigration status "will inevitably vary for innumerable reasons, including: the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits." *Id.*

AW is now approximately ten years old and thus old enough to form meaningful attachments to her new environment. *See Gwiazdowski v. Gwiazdowski*, 2015 WL 1514436, at *4 (E.D.N.Y. Apr. 3, 2015) (finding that children aged eight and ten years, respectively, were "old enough to form meaningful attachments to their new environment."). However, "[w]hile the age of the abducted child is a factor to be considered, courts are not in total agreement as to the existence of a correlation between age and degree of settlement." *Broca v. Giron*, 2013 WL 867276, at *6 (E.D.N.Y. Mar. 7, 2013), *aff'd*, 530 F. App'x 46 (2d Cir. 2013). To be sure, the age of an older child may "cut in favor of a finding of settlement if the child has few relatives, friends, and social involvements in his or her home country, and has them [in the United States]," but "it cannot be said that an older child is either less settled or more settled than a younger child." *Id.* Moreover, the

13

extent to which AW has grown up in this country, forming attachments here and losing those with her relatives in Poland, is the result of Filipkowska's violation of Wtulich's rights. Relying too heavily on AW's age or the relative strength of her relationships with friends and family would frustrate the Convention's objectives.

Reliance on other factors that favor Filipkowska is similarly in tension with the Convention's goals. AW regularly attends school where she achieves high honors, she engages in extracurricular activities, and she has a best friend with whom she plays and goes on trips. *See* Tr. at 98. Transferring to a school in Poland, where her lessons will be in a language she barely understands and cannot currently read or write will unquestionably be extremely difficult and disruptive. But that too is the consequence solely of Filipkowska's own misconduct.

Other factors weigh against finding that AW is settled in this country. First, both AW and Filipkowska lack legal status in the United States.[5] The government could initiate removal proceedings against either or both at any moment – and, as recent events make clear, might well separate them in doing so. Every day that AW spends in this country thus not only injures Wtulich's parental rights, but also carries a very real risk that Filipkowska's actions will result in AW experiencing the significant trauma of being separated from both of her parents indefinitely before being returned to Poland, a country that she would then recognize even less well than she does now.

---

[5] Filipkowska testified that as of the trial date, she was still "seeking adjustment" of her immigration status and that her green card petition – which was filed on August 31, 2017 – remained pending. *See* Tr. at 110; Ex. P. Filipkowska has not provided notice of any change to her status. Thus, as far as the record reveals, she may well be at risk either of being removed from the United States along with AW, or of being separated from AW if the latter alone is subject to removal.

Nor can Filipkowska unilaterally protect AW from that risk even if she prevails in this action: without Wtulich's consent to obtain a new passport, AW cannot secure legal status in this country.

Second, Filipkowska has not demonstrated that AW is growing up in an environment of financial stability. Filipkowska testified that she has a work permit, and she appeared to have reported as much to Wtulich who, in a 2013 email, wrote that he was "glad" she was then "working and making money." *See* Tr. at 110; Ex. U. I do not credit such evidence as showing AW to be settled here for several reasons. As a threshold matter, Filipkowska appears never to have had the legal right to work in this country: she arrived on a tourist visa and then remained here without legal status. Indeed, she has not offered any evidence that she now has a paying job or that she had one at the time of the trial. In any event, without legal status, any work Filipkowska might find would offer scant promise of stability. Moreover, Filipkowska's 2016 tax returns report income for herself and her husband that amounts to under $20,000 per year. *See* Ex. I.

Third, AW has not had a stable residence while in the United States. She attended kindergarten and first grade at one school in New York, but then transferred to another school in New Jersey for third and fourth grades. *See* Answer at 3-4; Tr. at 130. AW's academic and social success thus says less about the extent to which she is settled in the United States than it does about her adaptability and resilience.

Finally, an assessment of the extent to which AW is "settled" in this country must take into account the fact that her parents have been involved in a legal dispute over where she should live since at least June 2014 when Wtulich filed his ICARA Application – well over eighty percent of the time she has been in the United States. She has spent most of her childhood trapped in her parents' legal dispute about where she would grow up, which necessarily undermines the stability of any

15

environment she might have experienced. Moreover, whatever AW may have known about this lawsuit, the record includes evidence, which I credit, that both Filipkowska and her parents have threatened to "hide" AW from Wtulich. *See* Tr. at 49. That threat creates a risk of diminished stability and security for AW. Weighing all of the circumstances, I find that Filipkowska has not established that AW is settled in this country.

   2.   Acquiescence

Filipkowska next asserts that Wtulich consented to AW's retention in the United States. *See* Filipkowska FFCL ¶¶ 13, 31 (citing Ex. U; Ex. V; Ex. W). She also contends that Wtulich's application for access to AW demonstrates further evidence of his acquiescence. Although the Convention and ICARA recognize the availability of such a defense, *see* Convention art. 13 (requested State "is not bound to order" a child's return if the person opposing it establishes that the party seeking return "had consented to or subsequently acquiesced in the removal or retention"); *see also* ICARA, 22 U.S.C. § 9003(e)(2)(A), (B), as explained below, I find Filipkowska has not established that it applies in this case.

I do not infer from the emails Filipkowska cites that Wtulich was willing to allow AW to remain in the United States. As discussed above, I credit his testimony that he wrote those emails to placate Filipkowska rather than risk having her hide AW from him. Similarly, Wtulich's initial attempt, in filing the ICARA Application, to secure access to AW rather than her repatriation does not establish his acquiescence within the Convention's meaning. *See Friedrich*, 78 F.3d at 1070 ("Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights."); *see also In re Koc*, 181 F. Supp. 2d at 150 (citing *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1290 (S. D. Fla. 1999) (holding that a father who allowed his children to remain in

16

Florida while he made "serious and concerted efforts at reconciliation" prior to filing a petition did not acquiesce within the meaning of the Convention)); Linda Silberman, *Hague Convention on International Children Abduction: A Brief Overview and Case Law Analysis*, 28 Fam. L.Q. 9, 26 (1994) (noting that "as a general rule courts should be careful not to translate negotiation into acquiescence. To do so could lead lawyers to refuse to talk or negotiate at all for fear of creating the impression of acquiescence and could encourage litigation at the expense of a more amiable resolution.").

To establish her acquiescence defense, Filipkowska must show "either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *In re Koc*, 181 F. Supp. at 151 (quoting *Friedrich*, 78 F.3d at 1070). Although Wtulich wrote in his Application that he would "respect [Filipkowska's] decision to stay in the [United States], subject … to [his] rights … to maintain meaningful contacts with [his] daughter," he started by noting his desire for AW "to continue to live in Poland." Application at 3. Wtulich also testified that he did not draft the Application's text himself or check the box on the form's front page selecting a remedy, but that his counsel did so. After counsel filed the Application, Wtulich asked him to file a petition for return instead, to no avail. *See* Tr. at 73-74.[6] Here again, I find Wtulich's testimony credible and conclude that the record does not establish that he ever intended to allow Filipkowska to retain AW in this country permanently. While Wtulich managed, albeit with some difficulty, to testify in English at the trial, I find he was necessarily relying on counsel's assistance in filing that Application and that any language in that document suggesting acquiescence to Filipkowska's actions did not accurately

---

[6] Wtulich's counsel of record in this action was not involved in filing the Application. *See* Tr. at 74.

17

reflect his intent. The Application is thus not "a convincing written renunciation of rights" and the record does not otherwise reveal that Wtulich demonstrated "a consistent attitude of acquiescence over a significant period of time." *In re Koc*, 181 F. Supp. 2d at 151 (quoting *Friedrich*, 78 F.3d at 1070). I therefore find that Filipkowska has failed to establish the defense of acquiescence.

### 3. AW's Preference to Remain in the United States

In her findings of fact and conclusions of law, Filipkowska raises a third defense not included in her Answer: that AW prefers to remain in the United States. *See* Filipkowska FFCL at 13-14. The Convention "permits a court to 'refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [her] views.'" *Blondin IV*, 238 F.3d at 166 (quoting Convention art. 13). Indeed, "a court may refuse repatriation *solely* on the basis of a considered objection to returning by a sufficiently mature child." *Id.* (emphasis in the original). Thus, if AW is of sufficient age and maturity, her objection to the Petition "may be conclusive[.]" *Id.* (internal citations omitted).

There is no precise age at which a child is deemed sufficiently mature under the Convention. *See Laguna v. Avila*, 2008 WL 1986253, at *9 (E.D.N.Y. May 7, 2008) (citing *Blondin IV*, 238 F.3d at 166) (concluding that the district court did not err in finding that an eight-year-old was sufficiently old and mature for her views to be considered as one factor in its grave risk analysis)). Rather, a child's maturity is a question to be determined upon the specific facts of each case. *See id.*

I interviewed AW at the end of the trial, at which time she was nine years old. Her English was excellent. When I asked if she understood the nature of what was going on, she responded, "[Wtulich] wants to take me to Poland and I don't want to go there. And my Mom doesn't want me to go there either." Tr. at 128. She further indicated that she did not remember much about her life

18

in Poland. However, she did tell me that she remembered having a friend with whom she would have a lot of play dates. AW also said that Wtulich "doesn't seem very nice. He looks like he would just start yelling at people." *Id.* at 131. However, she did not remember him ever yelling at her or anyone else. *See id.* When I asked AW what kind of relationship she would like with her parents in the future, she responded, "Just for me to live with my mom. And just like maybe visit [Wtulich] a little bit, not too much." *Id.* at 135. She also stated that the she would rather the visits be in the United States, because "it's more fun here. I like it better here than Poland." *Id.*

Based upon this interview, I find that while AW was articulate, she was not sufficiently mature to give thoughtful consideration to my questions. For example, her suggestion about visiting Wtulich in Poland ignores the reality that her immigration status – certainly as it is now, and possibly even if her parents agree to get her a passport – might preclude her from traveling back and forth for such visits. Similarly, her discussion glosses over the issue of whether and how her parents could afford such international visits. Finally, her focus on the extent to which visiting Wtulich in Poland might be fun bespeaks a childlike attitude that cannot be dispositive. I therefore find that AW has not yet attained an age and a degree of maturity that requires me to accede to her objection. I also find that while her view can and does weigh in the balance, it does not outweigh Wtulich's right to her return. *See Poliero v. Centenaro*, 2009 WL 2947193, at *21 (E.D.N.Y. Sept. 11, 2009) (declining to give weight to the considered objections of thirteen- and nine-year-old children).

III.  Conclusion

For the reasons set forth above, I find that the petitioner has established that the respondent wrongfully retained their daughter in violation of the Convention and that the respondent has failed to establish any applicable exception. I therefore grant the petition and order the respondent to

19

return the parties' daughter to her habitual residence of Poland promptly. I respectfully direct the Clerk to enter judgment accordingly, but to defer closing the case to accommodate the following supplemental proceedings. Specifically, I respectfully direct the parties to confer and to submit a jointly proposed transition plan by March 27, 2019, that provides for the petitioner to have access to the parties' daughter until her return to Poland, as well as for the parties to secure a passport for their daughter. The petitioner may file a request for the payment of his necessary expenses incurred in connection with this proceeding by April 30, 2019. Any such request for legal fees must include counsel's contemporaneous billing statements; any request for other costs must include a detailed explanation of how each expense for which payment is sought was necessarily incurred to prosecute this action. The respondent may file any objections to the bill of costs by May 14, 2019.

SO ORDERED.

Dated: Brooklyn, New York
March 20, 2019

_____/s/_____
James Orenstein
U.S. Magistrate Judge